T.C. Memo. 1996-456


UNITED STATES TAX COURT


DON BALLANTYNE AND SUSANNE C. BALLANTYNE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13255-94.                    Filed October 10, 1996.


<u>Kevin M. Bagley</u>, for petitioners.

<u>Jeffrey A. Hatfield</u> and <u>Mary Tseng Klaasen</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>:  Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes:

|       |            | Additions to Tax | | |
| Year | Deficiency | Sec. 6653(a)(1)[1] | Sec. 6653(a)(2) | Sec. 6661 |
| 1985 | $388,937 | $19,447 | [2] | $ 97,235 |
| 1986 | 950,703 | 47,535 | [2] | 237,676 |

[1] The addition to tax for negligence or intentional disregard of rules or regulations is codified under sec. 6653(a)(1)(A) and (B) for 1986.

[2] 50 percent of the interest due on the deficiency.

Susanne Ballantyne is a party to this case by virtue of having filed a joint return for the years under consideration with her husband, Don. Accordingly, Don Ballantyne hereinafter will be referred to as petitioner.

Some of the issues raised by the pleadings have been disposed of by agreement of the parties. The principal unagreed issue focuses on the transfer of 86 acres of land located in Escondido, California (the Escondido property), in 1985 from petitioner to Balmac, Inc. (Balmac), an entity he controlled. Our task is to determine whether that transfer should be characterized as a sale, as respondent contends, or a tax-free exchange, as petitioner urges.[1] In the event we determine that the transfer constituted a sale, then we must determine the amount of gain petitioner must recognize therefrom. Other unagreed issues are: Whether petitioners had $40,188 of unreported interest income in 1986;

_____

[1] As will be discussed _infra_, petitioner claims that he contributed approximately 44.25 acres of the Escondido property to BTG Corp., a Delaware corporation, in exchange for 1,000 shares of its stock, and that the balance of the acreage was transferred on petitioner's behalf to Balmac.

whether petitioners are entitled to deduct $122,605 in 1986 for interest petitioner paid to Escondido Property Investment Corporation; and whether petitioners are liable for additions to tax under sections 6653(a)(2) and 6653(a)(1)(B) for 1985 and 1986, respectively, on the portion of the underpayment attributable to the transfer of the Escondido property to Balmac.

All section references are to the Internal Revenue Code for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

### Background

Petitioners resided in San Diego, California, at the time they filed their petition.

Petitioner completed 2 years of college and thereafter went to work for a company involved in real estate development. He remained there for approximately 10 years before going out on his own when he formed Balmac to engage in the development of real estate.

At all relevant times, (1) petitioner owned all of the stock of Balmac, and (2) Balmac owned all of the stock of Westland Holding Corp., which in turn owned all the stock of Westland Title Co., Inc. (WTC).

In 1978, petitioner purchased approximately 106 acres of

unimproved land in Escondido, California, from Balmac (which had purchased the property in the early 1970's). In connection with petitioner's purchase of the land, petitioner gave Balmac a note which was secured by a trust deed on the property. The 106 acres so acquired by petitioner included the Escondido property. In 1979, title to the Escondido property was transferred to WTC, as nominee for petitioner, and held for petitioner's benefit under the terms of Holding Agreement No. 1037 (Holding Agreement). Petitioner used the name "Don McLane"[2] in the Holding Agreement and was identified as owner of the Escondido property. Petitioner paid property taxes and other costs associated with the Escondido property.

The Escondido property was zoned for industrial use. In order to commercially develop and sell the Escondido property, it had to be mapped and subdivided into smaller parcels. As developed, the Escondido property was known as Wine Ridge Industrial Park.

Sale to Balmac

On November 8, 1984, Balmac and petitioner executed a "Real Estate Purchase Contract and Receipt for Deposit" (the purchase agreement), providing for the purchase of the Escondido property by Balmac from petitioner for $7 million. Byron P. Halling (Halling),

---

[2] Petitioner was raised by his aunt and uncle, whose surname was McLane. Petitioner used his birth surname of Ballantyne until age 12. He then used his aunt and uncle's surname for approximately 40 years (until the early 1980's) when at the urging of his wife and children he resumed using his birth surname.

an attorney, executed the purchase agreement on behalf of petitioner; petitioner signed the purchase agreement on behalf of Balmac.

The purchase agreement provided that Balmac would make a $2 million cash down payment; the balance of the purchase price was to be deferred and evidenced by a 5-year, interest-bearing note. Closing was to take place by December 31, 1984.

Sometime in early November 1984, Balmac entered into an agreement with Palomar Systems and Machines, Inc. (Palomar), to develop and sell to the latter a 10-acre lot in Wine Ridge Industrial Park.

Closing under the purchase agreement did not occur by December 31, 1984. Rather, on February 6, 1985, Halling and petitioner executed escrow instructions (escrow No. 10425-04) with WTC with respect to the contemplated purchase of the Escondido property by Balmac.

In June 1985, Balmac applied for a loan from First Commercial Bank of San Diego (the bank) with respect to the development of the Escondido property. The borrowing was to occur in two stages. The first of the two stages was to be with respect to the acquisition of the property; this loan was to be in the amount of $1.1 million. The second was to be a $3 million development loan. With respect to the land acquisition loan, the loan application request stated:

> The land purchase calls for $2,000,000 cash
> down. We will be putting up $950,00, and
> would like First Commercial Bank to loan the

balance * * * These funds [$1,100,000] will be used: $1,050,000 for land purchase, and $50,000 for costs and interest. This land acquisition loan can be secured by a first [ ] deed of trust on 86 acres that we are purchasing for $7,000,000. When the development loan [$3,000,000] is recorded this loan will be paid in full.

Petitioner led the bank to believe that Halling was the owner of the Escondido property.

Both loan requests were approved by the bank. Petitioner individually guaranteed repayment of the $1.1 million land acquisition loan. Closing for the acquisition loan (which was handled by WTC) occurred on July 31, 1985. As of closing, WTC had received funds totaling $2 million; $1,050,000 from the bank, and $950,000 from Balmac. WTC issued a check for $1,960,680.25 ($2 million less seller's escrow-related fees and costs) made payable to itself as petitioner's nominee under the Holding Agreement.

Recorded Documents

On July 31, 1985, the following documents were recorded in the San Diego County Recorder's Office: (1) A grant deed from WTC, acting under the Holding Agreement, to Balmac with regard to the transfer of the Escondido property; (2) a deed of trust encumbering the Escondido property executed by Balmac in favor of the bank to secure the $1.1 million land acquisition loan; and (3) a subordinated purchase money deed of trust executed in favor of WTC under the Holding Agreement to secure the balance due by Balmac as evidenced by Balmac's $5 million note.

On October 25, 1985, the following documents were recorded in the San Diego County Recorder's Office: (1) A full reconveyance by the bank to Balmac of the Escondido property which had previously been conveyed to the bank to secure Balmac's $1.1 million loan; and (2) a deed of trust with respect to a portion of the Escondido property executed by Balmac in favor of the bank to secure Balmac's note for $3 million covering a portion of the Escondido property.

On February 7, 1986, a partial reconveyance by WTC, as Trustee, to Balmac with respect to the property securing the deed of trust that had been recorded on July 31, 1985, was recorded in the San Diego County Recorder's office. On April 18, 1986: (1) A full reconveyance by WTC, as Trustee, to Balmac with respect to the remaining acreage of the Escondido property that had not been released or sold to Palomar; and (2) a grant deed from Balmac to Palomar for that portion of the Escondido property that was sold to Palomar, were recorded in the San Diego County Recorder's office.

Development of Wine Ridge Industrial Park

A total of 44.25 acres of the Escondido property was developed and sold as lots (including the property sold to Palomar). All negotiations regarding the sale of these lots were undertaken by Balmac. All correspondence regarding the negotiations for the sale, and all documents related to the sale of these lots were signed by petitioner, as president of Balmac. Balmac signed the deeds to all sold lots.

BTG Corp.

BTG Corp. (BTG) was incorporated in Delaware on September 28, 1981. Prior to July 30, 1985, BTG was a dormant corporation.

BTG had been formed by AMCOR, a California corporation, which incorporated and sold other corporations primarily to attorneys for tax planning activities. From 1984 to 1988, AMCOR had only two employees, Robert Burton (Burton) and Lisa Aspoy. Ms. Aspoy is, and at all relevant times was, the wife of Mark Schiavenza (Schiavenza).

Schiavenza is an attorney specializing in the field of taxation. From October of 1975 to January or February of 1981, he practiced law with Harry Margolis, whose tax planning strategy (which involved the circular transfer of funds through the use of offshore entities, trusts, and shell corporations) has been repudiated by this Court on numerous occasions. See Marine v. Commissioner, 92 T.C. 958 (1989), affd. without published opinion 921 F.2d 280 (9th Cir.1991); Erhard v. Commissioner, T.C. Memo. 1991-290, modified T.C. Memo. 1992-376 and T.C. Memo. 1993-25, affd. 46 F.3d 1470 (9th Cir. 1995); Leonard v. Commissioner, T.C. Memo. 1985-51, affd. without published opinion sub nom. Robinson v. Commissioner, 816 F.2d 684 (9th Cir. 1987).

Schiavenza represented various real estate developers and referred them to AMCOR as clients. Schiavenza also represented Escondido Property Investment Corp. (EPIC), Oi Weng Co. Ltd., a

Hong Kong corporation, and the Marwick Trust, a purported offshore trust formed in Guernsey, the Channel Islands.

Petitioner was a client of Schiavenza. Upon the advice of Schiavenza, in October 1985, petitioner entered into a management contract with AMCOR with respect to BTG.[3] In connection with that arrangement, petitioner agreed to acquire all the stock of BTG in exchange for a portion of the Escondido property. Corporate minutes authorizing petitioner's acquisition of the BTG stock were backdated to July 30, 1985.

Capitalization Agreement

Petitioner's acquisition of BTG stock for property was memorialized in a Capitalization Agreement that was backdated to

---

[3]     During the years 1984 to 1988, AMCOR provided management services to numerous corporations, including BTG and EPIC. For an annual fee, AMCOR provided the purchaser with a domestic corporation and services related to the management of that corporation, including but not limited to the following: (1) Supplying individuals to serve as directors, officers, and bank signatories; (2) supplying a registered agent for the purpose of accepting service of process on the corporation; (3) filing annual information reports and payment of any annual fees to the secretary of state and other authorities of the State of the corporation's formation; (4) holding annual shareholders' meetings or preparing consents of shareholders in lieu thereof; (5) holding directors' meetings; (6) preparing corporate minutes of stockholders' meetings and meetings of directors; (7) maintaining corporate bank accounts as required; and (8) executing documentation prepared by counsel on behalf of the corporation and administering transactions established by said documentation.

AMCOR's normal practice was to have its employees serve as officers and directors for its client corporations. Occasionally, AMCOR used the employees of the offices of those attorneys utilizing AMCOR's services to serve as officers and/or directors of AMCOR's client corporations.

July 30, 1985.    The agreement was signed by petitioner as "shareholder" and by Burton on behalf of BTG.

The introductory part of the Capitalization Agreement states that: (1) Petitioner owns the Escondido property but legal title to the property is being held by WTC, under Holding Agreement No. 1037 for the benefit of petitioner; (2) Balmac is engaged in redeveloping and marketing a portion of the Escondido property (amounting to 44.25 acres) and that it expects that acreage to be developed and marketed over the course of the next 24 months; and (3) petitioner wishes to transfer the 44.25 acres to BTG in exchange for 1,000 shares of BTG stock.    The Capitalization Agreement  provides for:  (1)  An assignment of the 44.25 acres from petitioner to BTG; (2) petitioner's agreement to execute and deliver to WTC an assignment of beneficial interest under Holding Agreement 1037; (3) effective July 30, 1985, BTG will have all rights of direction and control under Holding Agreement No. 1037; (4) an agreement by BTG to enter into a joint venture agreement with Balmac to further develop and sell the 44.25 acres and, in this regard, (5) an agreement by BTG to instruct WTC to transfer the entire acreage of the Escondido property to Balmac and to instruct Balmac to hold the 44.25 acres for benefit of the joint venture between BTG and Balmac and the balance of the 86 acres for the benefit of petitioner. The Capitalization Agreement further states that: (1) The parties understand that it is to their mutual

benefit that Balmac acquire title to the entire 86-acre Escondido property to enable Balmac to conclude arrangements to borrow $1,100,000 from First Commercial Bank; (2) the parties intend to effect a section 351 tax free capitalization; and (3) the tax base on the 44.25 acres is a carryover basis.

The Capitalization Agreement requires Balmac to lend the proceeds of the $1.1 million land acquisition loan to BTG, which thereafter is to lend the proceeds to petitioner.  Petitioner is then required to transfer approximately $940,000 to Balmac as a repayment on his prior indebtedness to Balmac.

The transactions contemplated by the Capitalization Agreement occurred.  Petitioner contributed 44.25 acres of the Escondido property to BTG in exchange for 1,000 shares of BTG stock.  BTG entered into a joint venture agreement with Balmac and contributed the 44.25 acres of the Escondido property to the joint venture (the Wine Ridge Joint Venture).  The proceeds of the bank loan were lent to BTG, which then lent such proceeds to petitioner, who then transferred the money to Balmac in repayment of his prior purported debt.

## EPIC, Oi Weng, and the Marwick Trust

EPIC was incorporated on March 24, 1986.  Oi Weng Co., Ltd. (Oi Weng), a Hong Kong corporation, was the sole shareholder of EPIC.  Oi Weng was wholly owned by the Marwick Trust. The trustee of the Marwick Trust was Grange Trustees Ltd., a wholly owned

subsidiary of Rea Brothers (Guernsey) Ltd. Petitioner was the "First Trust Protector" for the Marwick Trust; Susanne Ballantyne was the successor trust protector.

EPIC was formed at the request of Schiavenza. Schiavenza's wife (Lisa Aspoy) was the president of EPIC during 1986, 1987, and 1988.

EPIC signed a management agreement with AMCOR, effective March 27, 1986.

On April 15, 1986, petitioner sold his 1,000 shares of BTG stock to EPIC for $3.6 million on an installment basis. On April 16, 1986, BTG liquidated and distributed all of its assets (a $1.1 million note from petitioner and BTG's interest in the Wine Ridge Joint Venture) to EPIC.

The $3.6 million purchase price was evidenced by a 20-year installment note ($3.6 million note). The terms of the $3.6 million note called for the payment of interest at the rate of 9.33 percent per annum, payable semiannually, beginning October 15, 1986. Principal was to be paid in 20 equal installments of $180,000 per year, beginning April 15, 1987. The $3.6 million note was secured by an offshore Channel Islands escrow account managed by Rea Brothers. Funding for the offshore escrow account was to come from distributions from the Wine Ridge Joint Venture (which were to be made to EPIC by virtue of EPIC's interest in the joint venture) and from payments due EPIC from petitioner (with regard to petitioner's $1.1 million obligation to BTG).

OPINION

Positions of the Parties

Petitioners contend that the sale of the Escondido property to Balmac was a fiction and that it was in essence part of a financing transaction. They maintain that the $950,000 deposited by Balmac with WTC was never intended to be for the benefit of petitioner or distributed to him. According to petitioners, the loan from the bank (purportedly for the purchase of the Escondido property) was in reality a loan to the joint venture (which then lent the proceeds to BTG, which in turn lent the proceeds to petitioner). Petitioners request that we find, as an ultimate fact, that petitioner "received no net proceeds from the sale of any portion of the Escondido property in 1985 or 1986" and that petitioner "received no compensation or other consideration in exchange for the $5 million deed of trust."

Petitioners' version of events is that petitioner transferred 44.25 acres of the Escondido property to BTG in exchange for stock and caused the remaining 41.75 acres to be deeded to Balmac as nominee for petitioner. Accordingly, petitioners characterized the transfers as tax-free exchanges under section 351.[4] They contend

---

[4] Sec. 351(a) provides:

SEC. 351(a). General Rule.--No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or
(continued...)

that BTG subsequently contributed the 44.25 acres to the joint venture. In the alternative, petitioners contend that some or all of the Escondido property was contributed to Balmac as a capital contribution (which would also constitute a tax-free exchange).

In contrast, respondent argues that "the purported section 351 exchange asserted by petitioner [is] nothing more than an attempt, engaged in subsequent to the completion of the Balmac transfer, to recast the form of the sale transaction to obtain a more favorable tax consequence." Respondent maintains that the transfer by petitioner to Balmac of the Escondido property on July 31, 1985, should be characterized as a sale and that in 1985 petitioner incurred a long-term capital gain in the amount of $1,648,722 (as a result of receiving $2 million in cash) and that in 1986 petitioner incurred a long-term capital gain in the amount of $4,121,930 (as a result of the cancellation of the $5 million installment note received in connection with the sale).

Balmac Contract

The structure of the transaction in this case is unmistakable. All the documents and objective evidence support characterizing the transfer of the Escondido property from petitioner to Balmac as a sale. The purchase agreement provided for the purchase of the Escondido property by Balmac from petitioner for $7 million.

---

4(...continued)
securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

Petitioner, on behalf of Balmac, applied for and obtained a $1.1 million bank loan based on a number of representations that were consistent with a sale to Balmac. Further, there was a grant deed and deed of trust which were filed with the San Diego County Recorder's office. And finally, there was the escrow check for $1,960,680.25 that was delivered to petitioner's nominee, WTC under the Holding Agreement, as seller, and a $5 million installment note that was secured by the recorded deed of trust.

Petitioners did not attempt to show that the sale transaction to Balmac was the result of mistake, undue influence, fraud, or duress. Instead, they ask us to disregard the transaction as nothing but a ruse to obtain the $1.1 million bank loan and want us to believe that the transaction was as they reported for tax purposes. We refuse to do so. "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not." Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974).

Where a taxpayer seeks to disavow what is purported to be a sale, the burden lies with the taxpayer to prove error in the Commissioner's determination that the transaction was in fact a sale. Shannon v. Commissioner, 29 T.C. 702, 718 (1958). Here, petitioners failed to prove error in respondent's determination.

We accept the structure of the transaction as cast by petitioners. The substance of the transfer of the Escondido property from petitioner to Balmac comports with the form of a sale transaction. Consequently, we sustain respondent's determination that petitioner sold the Escondido property to Balmac.

Having determined that a sale occurred, we turn to the tax consequences flowing from petitioner's sale to Balmac. The purchase price for the Escondido property was $7 million. At closing Balmac paid $2 million in cash and gave a $5 million installment note. Security for the note was reconveyed to Balmac in 1986, and there is no evidence that any obligation to pay the note remained. The reconveyance of the note amounts to a cancellation of the note. The cancellation requires recognition of gain of $4,121,930 under section 453B(a) and (f) in 1986.[5]

---

[5] Sec. 453B(a) provides in part:

SEC. 453B(a). General Rule.--If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and--

* * * * * * *

(2) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Sec. 453B(f) provides:

(continued...)

An installment obligation is canceled when there is "any cessation of an obligation to pay that would otherwise continue to exist." Estate of Frane v. Commissioner, 98 T.C. 341, 350 (1992), revd. in part on other grounds 998 F.2d 567 (8th Cir. 1993). The fact that cancellation occurred within a short time after the note was given to petitioner does not preclude or otherwise affect the application of section 453B. See Utley v. Commissioner, 906 F.2d 1033 (5th Cir. 1990), vacating T.C. Memo. 1988-575.

Claimed BTG Sale

Petitioners claim that the Escondido property was sold to BTG on July 30, 1985. However, a grant deed conveying the Escondido property to Balmac was recorded in the San Diego County recorder's office on July 31, 1985. And petitioner admitted that several of the documents involved in the claimed section 351 transaction with BTG--although dated July 30, 1985--were signed sometime after July 31.

---

[5](...continued)
    SEC. 453B(f). Obligation Becomes Unenforceable.-- For purposes of this section, if any installment obligation is canceled or otherwise becomes unenforceable--

       (1) the obligation shall be treated as if it were disposed of in a transaction other than a sale or exchange, and

       (2) if the obligor and obligee are related persons (within the meaning of section 453(f)(1)), the fair market value of the obligation shall be treated as not less than its face amount.

The only business conducted by BTG was the receipt of property in a claimed section 351 transaction and the transfer of property to the joint venture. The $1.1 million bank loan supposedly made to the joint venture, lent again to BTG, and then to petitioner, in our opinion, was simply an attempt to create a basis for interest deductions for petitioner. Further, petitioner's sale of BTG stock to EPIC was, in our opinion, done in order to create an increase in petitioner's basis in the property (from $582,039 to $3.6 million) prior to the sale of developed lots; and the 20-year, $3.6 million note petitioner received in exchange for the stock was an attempt to defer recognition of gain.

Respondent contends that the purported sale of the Escondido property to BTG and the subsequent sale of the BTG stock to EPIC were a series of sham transactions devoid of economic substance. We have defined that which constitutes a sham in substance as "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner, 85 T.C. 332, 347 (1985).

We find that petitioner's transactions with BTG and the sale of BTG's stock to EPIC had no economic substance and were intended only to accomplish tax-motivated objectives. They were sham transactions, and we will disregard them.

Unreported Interest Income

The next issue is whether petitioners had $40,188 of unreported interest income in 1986. Petitioners presented no credible evidence to rebut the presumption of correctness afforded the notice of deficiency. (We were not impressed with the credibility of petitioner's testimony.) Accordingly, we sustain respondent's determination that petitioners are liable for unreported interest income of $40,188 in 1986.

Interest Deduction

The third issue is whether petitioners' deduction of $122,605 in 1986 for interest paid to EPIC should be disallowed. Interest is not deductible "if the underlying transaction is a sham * * *. Nor is interest deductible if it is incurred in a transaction 'that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences.'" Sheldon v. Commissioner, 94 T.C. 738, 760 (1990) (citations omitted).

In view of our finding that the sale of the BTG stock to EPIC was a sham transaction, the interest payments to EPIC are not deductible.

Negligence

The final issue is whether petitioners are liable for additions to tax under sections 6653(a)(2) and 6653(a)(1)(B) on the portion of the underpayment attributable to the transfer of the Escondido property to Balmac. Petitioners have conceded the application of all additions to tax raised in respondent's notice

of deficiency with respect to all other matters.  Petitioners claim, however, that they were not negligent, that they reasonably relied on the advice of experts, and that there was substantial authority for their position.

Sections 6653(a)(2) and 6653(a)(1)(B) impose an addition to tax of 50 percent of the interest on the portion of an underpayment of tax attributable to negligence or intentional disregard of rules or regulations.  Negligence is defined as the failure to exercise the due care that a reasonable, prudent person would exercise under similar circumstances.  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Reliance on professional advice, by itself, is not an absolute defense to negligence.  A taxpayer first must demonstrate that his reliance was reasonable.  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Here, petitioners failed to do so.

Petitioner engaged in sham transactions.  Petitioner participated in the backdating of documents and in highly questionable transactions.  A prudent person would not have believed that these purported transactions served a purpose other than tax avoidance.

We conclude that petitioners were negligent and did not reasonably rely on the advice of experts.  Consequently, petitioners are liable for the additions to tax under sections

6653(a)(2) and 6653(a)(1)(B) for 1985 and 1986.

To reflect the foregoing and concessions by the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.